**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| ROBERTA L. FIELDS, | CASE NO. 1:23-CV-00035-SL |
| Plaintiff, | JUDGE SARA LIOI |
| v. | |
| COMMISSIONER OF SOCIAL SECURITY, | MAGISTRATE JUDGE CARMEN E. HENDERSON |
| Defendant, | **REPORT AND RECOMMENDATION** |

**I. Introduction**

Plaintiff, Roberta L. Fields ("Fields" or "Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits ("DIB"). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). For the reasons set forth below, it is RECOMMENDED that the Court OVERRULE Claimant's Statement of Errors and AFFIRM the Commissioner's decision.

**II. Procedural History**

On September 29, 2020, Claimant filed an application for DIB, alleging a disability onset date of April 30, 2019. (ECF No. 9 at PageID #: 62). The application was denied initially and upon reconsideration, and Fields requested a hearing before an administrative law judge ("ALJ"). (*Id.*). On January 14, 2022, an ALJ held a hearing, during which Fields, represented by counsel, and an impartial vocational expert testified. (*Id.*). On April 13, 2022, the ALJ issued a written decision finding Claimant was not disabled. (*Id.* at PageID #: 62-78). The ALJ's decision

became final on September 23, 2022, when the Appeals Council declined further review. (*Id.* at PageID #: 47).

On January 9, 2023, Claimant filed her Complaint to challenge the Commissioner's final decision. (ECF No. 1.) The parties have completed briefing in this case. (ECF Nos. 11, 14, 15). Claimant asserts the following assignments of error:

> (1) Whether the ALJ's assessment of Plaintiff's symptom allegations complied with the requirements of SSR 16-3p.
>
> (2) Whether the ALJ's RFC finding is supported by substantial evidence in the absence of any consideration of whether Plaintiff required a cane to assist with standing and walking.

(ECF No. 11 at 17).

### III. Background

#### A. Relevant Symptom Allegations

The ALJ summarized Claimant's symptom allegations:

> In documents, the claimant initially alleged disability due to cervical cord compression and stenosis, high blood pressure, anxiety, damaged nerves in her hands, reflux, insomnia, and depression. In a function report, she said she does not drive or go places, and is dependent on her daughters for assistance with daily activities, including getting dressed at times, caring for her hair, meal preparation, chores/cleaning, and shopping. She referenced balance issues, chronic pain throughout her body, and damaged nerves in her hands. The claimant said she uses a prescribed cane and is only able to walk for about 5-10 minutes before needing to stop due to chronic pain. She said she walks slowly and does not do any lifting. She said her left arm only goes about halfway up. The claimant said her conditions are getting worse. She said she is not able to turn her head to the right and has neck pain and a bulging disc on the right side. She mentioned physical therapy and taking medications such as amlodipine, lorazepam, losartan, pantoprazole, propranolol, and tizanidine. (Exhibits 3E-5E; and 8E).
>
> At the hearing, the claimant's representative referenced the claimant's age and long work history, and she emphasized her cervical spondylosis with radiculopathy and neuropathy in her hands, status post cervical fusion surgery in July 2020, her use of a cane after a fall that required hospitalization, her occasional use of a wheelchair and walker, and her depression and anxiety. The claimant testified that she is 66-years old and asked her grandson to come live

with her because she needs help after her neck surgery in 2020. She said she is left-handed and became unable to drive after her surgery because of her hand problems. She also has difficulty typing and writing. The claimant was trying in pursuing a master's degree, but does not have the concentration, memory, or patience that she once did.

The claimant reported problems involving her neck, hands, and hip with chronic pain and neuropathy, difficulty walking, and difficulty sleeping, as well as anxiety, impaired memory and concentration, and migraine headaches. She said her daughter and grandson do her shopping, and that she does not prepare meals and receives Meals-on-Wheels 5 days a week. She said her daughter does her laundry and helps her clean. The claimant said she is able to perform light chores on occasion like washing dishes and swiping the floor. She no longer does yard work. The claimant said she gets up when she is able to and that her grandson helps her walk down the street. She watches television and reads for limited periods during the day. She said she uses a cane whenever she goes out, and that she uses walls and furniture to support herself when walking inside her home. The claimant still uses a walker at times. She said cold makes her body hurt bad and impacts her ability to function. (Hearing Testimony).

(ECF No. 9 at PageID #: 67-68).

### B. Relevant Medical Evidence

The ALJ also summarized Plaintiff's relevant health records:[1]

With regard to the claimant's physical condition, records from the Cleveland Clinic confirm a history of treatment for conditions such as osteoarthritis with joint pain and degenerative disc disease with cervical pain, radiculopathy, and upper extremity neuropathy, along with radiating low back pain, headaches/migraines, right foot bunions and hammertoes (status-post surgery in September 2015), insomnia, fatigue, anemia, obesity (BMI ~ 30 kg/m2), hypertension, GERD, hyperlipidemia, and upper respiratory/sinus infections in the context of longstanding smoking. The claimant's treatment has included physical therapy and use of numerous medications like Mobic, Ambien, zolpidem, amlodipine, loratadine, lisinopril, omeprazole, meloxicam, ibuprofen, Imitrex, and tizanidine. Overall, treatment notes document relatively moderate abnormal objective findings and significant benefit from treatment. (Exhibit 8F).

For example, an MRI of the claimant's lumbar spine on November 9, 2015 revealed spondylosis with partial sacralization of the L5 vertebral body. The same day, a cervical MRI also showed cervical spondylosis that was most pronounced at C3-4 and C4-5 with effacement of thecal sac and mild compression of the cord,

---

[1] Because Claimant does not challenge the ALJ's findings concerning her mental impairments, the Court sets forth only the discussion relevant to Claimant's physical impairments.

3

without evidence for abnormal cord signal, and with right sided neural foraminal narrowing that was most pronounced at C2-3 through C4-5. (Exhibit 8F/76-79). An EMG/NCS of her right upper and lower extremities in December 2015 was unremarkable for the most part. (Exhibit 8F/444).

In response to complaints of an acute headache, a CT scan of the claimant's brain in August 2018 was negative for acute intracranial process. (Exhibit 8F/83-84). Another cervical MRI in October 2018 showed multilevel moderate degenerative disc and facet disease and no focal protrusion or extrusion. (Exhibit 8F/85-86). Right hip x-rays in June 2019 showed mild arthrosis hip joints and sacroiliac joints. Right knee x-rays showed degenerative changes at the lateral patellofemoral joint. (Exhibit 8F/87-89).

On April 12, 2019, which was shortly before the alleged onset date, she sought emergency treatment for a migraine headache with nausea, photophobia, and palpitations. She reported 8/10 pain and had elevated blood pressure (156/80 mmHg) but was not in distress and had not taken sumatriptan in one week. The claimant displayed good physical (and mental) functioning on examination, including range of motion, strength, muscle tone, reflexes, sensation, coordination, and gait. Moreover, she responded well to Toradol and Zofran, and said this was similar to all prior migraines. (Exhibit 8F/269-273).

On April 29, 2019, the day before her alleged onset date, claimant displayed good physical and mental functioning during an encounter with her doctor, Laxman Cingireddi, MD. She reported coughing, nasal congestion, sinus pressure, facial pain, headache, nausea, and body and muscle aches. However, other than elevated blood pressure (168/90 mmHg), an examination was within normal limits, including normal range of motion in her spine and extremities, no joint erythema or tenderness, normal muscular development, and normal gait. She was taking tizanidine, losartan, amlodipine, sumatriptan, loratadine, Ambien, omeprazole, tizanidine, and propranolol at the time. Dr. Cingireddi prescribed the claimant medication for her sinusitis and encouraged healthy diet, weight loss, and regular aerobic exercise. (Exhibit 8F/274-279).

In June 2019, the claimant reported pain in her right hip/upper buttock and low back, and right knee. However, other than right lumbosacral tenderness, diffuse right knee crepitus, and positive bounce test on the right, she displayed intact functioning during a visit with Mark Verdun, DO. (Exhibit 8F/279-280). Dr. Cingireddi also documented normal physical functioning other than hypertension, and he again recommended regular exercise. (Exhibit 8F/284-285). The claimant began physical therapy around this time.

On July 13, 2019, an MRI of the claimant's right knee showed tricompartmental degenerative arthrosis most advanced at the lateral patellofemoral articulation; osteochondral loose body posterior to the proximal PCL; intrasubstance degeneration of both menisci with no discrete tear demonstrated; small joint

4

effusion; and a popliteal cyst. (Exhibit 8F/90-91).

On July 25, 2019, the claimant began pain management with Samita Sumi Das, MD, who had a chance to review previous imaging. The claimant reported chronic pain in her neck, right upper extremity, and low back with right hand paresthesia, but other than mild cervical and trapezius tenderness to palpation, an examination was unremarkable. The claimant had full/normal/intact strength, range of motion, gait, and sensation. Dr. Das assessed cervical spondylosis, stenosis and right upper extremity radiculopathy in C3-4 distributions with right hand paresthesia. She recommended continued physical therapy and prescribed Topamax. (Exhibit 8F/286-291).

Dr. Das also gave the claimant a cervical nerve block/steroid injection on August 1, 2019. (Exhibit 8F/292). She went to the ER the next day complaining of a headache and neck pain, and she requested pain medicine. However, an examination was within normal limits, including normal blood pressure and no distress. (Exhibit 8F/294-297).

On August 10, 2019, the claimant sought emergency treatment for neck pain and headaches, and said she was involved in a motor vehicle accident 1 week earlier. However, an examination was normal. A cervical CT scan showed cervical spondylosis with some neuroforaminal narrowing, but nothing acute. (Exhibit 8F/94-95, 298-302). A CT scan of the claimant's brain was negative for acute intracranial process again. (Exhibit 8F/92-93).

Subsequent treatment notes from the Cleveland Clinic show complaints of ongoing symptoms in the second half of 2019 and early 2020, despite medication and physical therapy, and treatment for a couple of unrelated and acute issues (e.g., upper respiratory infection). However, they also continue to document good overall physical functioning during appointments with respect to the claimant's alleged conditions, including treatment notes from Dr. Cingireddi, Dr. Das, and other providers. (Exhibit 8F/302-341).

The claimant sought emergency treatment for right hip pain and difficulty bearing weight on February 23, 2020. Examination revealed some tenderness, and a right hip CT scan showed no acute osseous findings of the pelvis or right hip. It showed steatosis of the liver. (Exhibit 8F/97, and 342-346).

The claimant presented to the ER on April 7, 2020 with complaints of left-sided weakness and fatigue with 2 falls and left knee injury. She was unable to ambulate or bear weight on her left leg and had elevated blood pressure of 179/77 mmHg on initial examination. Labs revealed elevated glucose of 137 mg/dl, hemoglobin A1C of 7.1%, low-normal B12, and elevated cholesterol. The claimant underwent admission for a possible stroke, but an evaluation was largely unremarkable, including a CT scan and MRI of her brain. X-rays of the claimant's left femur, tibia, and fibula showed no acute fracture and only mild degenerative

change. Left ankle x-rays also showed no acute fracture. (Exhibit 8F/99-103, 110, 347-374). One doctor observed left foot pain and left lower extremity tenderness on examination, but normal functioning otherwise, including full strength contrary to the complaints of weakness. (Exhibit 8F/355).

Notably, during evaluation with an occupational therapist, the claimant reported independence with ambulation and activities of daily living, and she denied using assistive devices at home. She was on her way to the grocery store when one of her recent falls happened, and she reported an ability to drive, perform laundry at the laundromat, cook, and clean independently, with assistance from her daughter if needed. (Exhibit 8F/363). The occupational therapist observed some deficits, including 4+/5 upper extremity strength, impaired balance, and limited functional mobility. (Exhibit 8F/364). Physical therapy records show similar abnormalities. The claimant's condition improved markedly during the course of her admission, which lasted through April 9, 2020. The discharge diagnoses were fall with gait disturbance, left lower extremity weakness of unknown etiology, low vitamin B12, dyslipidemia, uncontrolled hypertension, new diagnosis of type 2 diabetes, and generalized anxiety disorder. (Exhibit 8F/366-374).

The claimant had improved, but still elevated blood pressure of 150/70 mmHg when she established care with Glenn Beck, MD, on April 14, 2020, as well as obesity with a BMI of 33 kg/m2. She had decreased lumbar range of motion and pain, positive straight leg raising on the right at 20 degrees, and right lumbar muscle spasms. She was able to heel and toe walk and had normal reflexes. (Exhibit 8F/374-377).

The claimant reported abdominal pain, constipation, and heartburn on May 21, 2020. She had abdominal tenderness on examination and x-rays showed a scattered small amount of colonic residue without evidence for obstruction or ileus, and an enlarged right liver lobe. Dr. Beck switched her omeprazole to pantoprazole. (Exhibit 8F/112, 378-380). On May 27, 2020, an abdominal ultrasound revealed hepatic steatosis. (Exhibit 8F/113-114). The claimant reported minimal improvement with the medication change. (Exhibit 8F/380). On June 10, 2020, an upper GI endoscopy only showed mild gastritis. (Exhibit 8F/382-385).

The claimant presented to orthopedist Jason Eubanks, MD, on June 12, 2020 for complaints of low back, right hip, and right upper extremity pain with balance and coordination problems, and numbness and tingling. She reported using a cane recently secondary to balance problems and displayed 4/5 strength in her upper extremities, positive left Hoffman's sign, 4+ hyperreflexia, and markedly ataxic gait on examination. X-rays showed a lumbar transitional sacral vertebra with disc degeneration at the cephalad vertebra and L4-L5 grade 1 spondylolisthesis. Dr. Eubanks said her symptoms were consistent with cervical spondylitic myelopathy. (Exhibit 7F/3-4).

Dr. Eubanks ordered a cervical MRI, which showed severe stenosis at C3-C6 with

cord compression and cord signal change, 10 degrees of kyphosis from C2-C7 and C4-C5 spondylosis at the area of greatest compression. He diagnosed cervical myelopathy with radiculopathy, kyphosis, spinal stenosis, spinal cord compression, and spondylolisthesis. He recommended surgery for decompression and fusion. (Exhibits 7F/10-11; and 9F/13-14). On July 22, 2020, the claimant underwent C4-C6 corpectomy, C3-C7 fusion and caging, and C2-T2 fusion. (Exhibit 7F/12-14).

At an orthopedic follow-up appointment on August 11, 2020, the claimant reported severe ongoing pain and radiculopathy in her neck and both upper extremities with numbness, tingling, and weakness, worse than before surgery. However, she displayed 5/5 strength in her upper extremities, except for 2/5 left deltoid strength, and she moved her arms and legs throughout the examination. She was not in acute distress and did not have any pain with shoulder joint rotation. X-rays revealed post-surgical changes and hardware, but in good position with no evidence of hardware failure. (Exhibits 2F/3; and 7F/15-19).

Subsequent orthopedic records show some reported improvement in the claimant's symptoms and functioning, but limited benefit from treatment overall and ongoing use of a cane or walker. Examination findings remain largely unchanged from those already discussed. The claimant reported severe pain at visits, but she was not in acute distress. (Exhibit 7F/20-34). They lifted all restrictions as of October 13, 2020, but also referred the claimant for physical therapy. (Exhibit 7F/28).

The claimant continued to treat with Integrative Pain Care for neck and low back pain in the second half of 2020 and early 2021. These records show radiating lumbosacral pain with weakness and numbness, and no reported improvement in her daily activities with medicine. The show good, but also temporary benefit from cervical injections. Notably, they also show relatively normal physical exam findings, including no distress and normal ambulation/gait, coordination, and movement of all extremities. (Exhibits 5F; 10F; and 12F).

The claimant sought emergency treatment for pain on September 13, 2020. She had neck pain with movement and torticollis on examination, and elevated blood pressure of 189/87 mmHg, but normal functioning otherwise. She received an injection of pain medicine and returned the next day for another. (Exhibit 8F/386-394).

The claimant reported severe ongoing pain on September 15, 2020, with chronic fatigue and trouble sleeping at night. She was having GI symptoms from the gabapentin, which she stopped taking, and had lost 19 pounds since their last visit. The claimant had elevated blood pressure, mostly likely due to pain, and was in moderate distress with mildly increased bowel sounds. (Exhibit 8F/395-398). The claimant returned to the ER for uncontrolled pain that same day and felt much better after medications. (Exhibit 8F/398-403).

7

On November 22, 2020, the claimant presented to the ER with complaints of right neck pain radiating down her right arm and right leg, and she requested a shot of morphine saying that is the only thing that helps. She denied weakness or gait abnormality, and an examination was unremarkable. However, the provider said she was tearful and seemed genuinely in distress. She agreed to a Toradol injection. (Exhibit 8F/404-407).

A CT scan of the claimant's lumbar spine on November 23, 2020 showed degenerative joint disease of the lumbosacral spine, but no evidence of fracture. (Exhibit 9F/11-12).

The claimant established pain management with a new provider on November 24, 2020. She complained of right leg pain and denied having much neck pain or arm discomfort. She did not think physical therapy was helping and asked for Vicodin on different occasions throughout the examination. Notably, the claimant reported 10/10 pain, but she was not in acute distress. She reported some tenderness, positive straight leg raising, and hypersensitivity on examination. She displayed right leg weakness, but with likely voluntary limitation. The provider said the exam was rather limited due to voluntary limitation, but that she described pain consistent with the L4 dermatome. He said hydrocodone would not be appropriate given her use of benzodiazepines, and he order a lumbar MRI and urine toxicity screen for further evaluation and care. (Exhibit 8F/408-413).

An ultrasound of the claimant's lower extremities on November 25, 2020 showed no evidence of deep vein thrombosis. (Exhibit 9F/9-10).

On December 4, 2020, the claimant presented with a request to be placed in inpatient short-term therapy. She reported swelling and inability to walk from a recent epidural injection, described herself as incapable of taking care of herself or performing activities of daily living on her own. Examination revealed somewhat subjective findings like decreased range of motion and use of assistive devices. (Exhibit 17F/27-33).

On December 7, 2020, an MRI of the claimant's lumbar spine showed multilevel degenerative changes most pronounced at L3-4 and L4-5 with neural foraminal narrowing most severe on the right at L3-4, partial sacralization of L5, and probable uterine fibroids. (Exhibit 9F/7-8).

A pelvic ultrasound on December 10, 2020 showed possible uterine fibroids and expanded and abnormal endometrium. (Exhibit 9F/6). On December 16, 2020, an MRI of the claimant's pelvis show leiomyomata of the uterus, normal endometrium thickness, and no pelvic mass or fluid. (Exhibit 9F/3-4).

Right knee x-rays on January 19, 2021 showed degenerative changes, including severe narrowing of the patellofemoral compartment. (Exhibit 12F/24).

Records from MetroHealth show persistent pain in the first half of 2021 with use of a cane and medications like Norco, tizanidine, Nabumetone, Robaxin, methocarbamol, and Ambien. Some adjustments were needed due to side effects. These records indicate that the claimant reported right hand pain before surgery and problems with her balance. She said she did relatively okay after the surgery, but that her pain was worse. At appointments, the claimant reported very high pain levels, including 10/10, but her doctor, Brenda Beck, DO, did not observe any distress. She observed increased cervical lordosis and tenderness, but also full strength, negative Hoffman signs, intact reflexes, and normal gait. (Exhibit 14F/21, 28, 35-36).

The claimant sought emergency treatment for gastroenteritis on February 5, 2021. She reported nerve pain and had elevated blood pressure of 172/81 mmHg, but an examination was otherwise within normal limits. (Exhibit 17F/19-24).

The claimant reported radiating neck and low back pain with headaches during a visit with Jonathan Belding, MD, on March 2, 2021. She was not in acute distress and walked with a forward slightly bent posture and pain in her upper and lower spine. She had subjective 4+/5 weakness in her hands, but mostly dysesthesias in her hands and feet. Cervical x-rays showed post-surgical changes/hardware with no obvious loosening or fracture. Dr. Belding believed she has failed neck syndrome status post very large reconstruction procedure and that her neck pain and headaches would never be completely resolved. He did not recommend more surgery but did recommend a spinal cord stimulator and/or medical marijuana. (Exhibit 14F/45-46).

The claimant had cervical tenderness and pain, a forward stooped posture, and tearfulness during a visit with Dr. Beck in March 2021. (Exhibit 14F/42). She returned to Dr. Beck for neck pain on May 21, 2021. She ambulated with a normal gait and a cane. She had elevated blood pressure but was not in distress. She had increased cervical lordosis and tenderness, but also full strength in her upper and lower extremities, negative Hoffman signs, and normal reflexes. Dr. Beck assessed post laminectomy syndrome with reactive myofascial pain. She continued her tizanidine and restarted Vicodin and discussed trigger point injections and ketamine infusion. (Exhibit 14F/10-16).

A cervical MRI on June 14, 2021 showed mild-moderate foraminal stenosis at multiple levels, but it did not show any significant spinal canal stenosis. (Exhibit 16F/22, 32). The claimant said the Vicodin was no longer working/helping around this time, but Dr. Beck observed unchanged examination findings. She gave her tramadol. (Exhibit 16F/16-23, 28).

Treatment notes from Dr. Beck on June 23, 2021 show uncontrolled hypertension and diabetes. The claimant had cervical tenderness and mildly reduced range of motion, as well as lumbar pain and reduced lumbar range of motion in all planes.

9

She reported some numbness and tingling in her feet, but a foot exam was normal and showed moderate bilateral callouses. (Exhibit 17F/13-16).

Records from an annual follow-up visit with Dr. Eubanks on July 13, 2021 indicate that the claimant was doing very well overall and grateful for her surgery. Dr. Eubanks said she was pleased and very appreciative for the care rendered. He observed normal examination findings, including 5/5 strength, and x-rays showed stable C2-T2 anterior posterior fusion that was well healed. He remarked that she is:

> … status post cervical thoracic anterior posterior fusion for profound spinal cord compression and myelopathy. From a neurologic standpoint, she has done very well. She is not struggling with any significant myelopathy symptoms at this time. She does have a degree of persistent posterior neck pain which is not uncommon for these kinds of procedures. She is following up with a pain management specialist…(Exhibit 15F/3).

The claimant continued to receive treatment for severe symptoms through the second half of 2021, including medications/pain management and lumbar injections. (Exhibits 16F; and 17). She received an L4-5 injection on August 4, 2021 but reported vomiting and a severe headache the next day. (Exhibit 16F/10-12). She received an infusion of lidocaine, ketamine, and propofol on September 2, 2021, but it was stopped due to increased blood pressure. (Exhibit 16F/4-6).

On September 15, 2021, the claimant told Matthew DePaul, APRN, that she was doing very well with tramadol, which was recently stolen while she was out of town. Nurse DePaul documented right sciatic notch tenderness, positive seated straight leg raising, significant right leg muscle weakness with likely voluntary limitation, and increased sensitivity to light touch along the right L4 distribution on examination. He recommended ongoing pain management. (Exhibit 17F/8-11).

The claimant reported no improvement from the infusion at a pain management visit on October 6, 2021. She said the tramadol was giving 20-30% pain relief, but the side effects were more than she wanted to deal with. (Exhibit 24F/30-34). The claimant received another infusion without incident on October 13, 2021. (Exhibit 24F/21).

The claimant attended a comprehensive eye exam on November 9, 2021. She reported driving, contrary to her testimony that she stopped driving after her neck surgery. She reported not seeing as well and blurring without her glasses. The claimant displayed good corrected visual acuity without retinopathy. Examination also revealed bilateral mild cataracts, meibomian gland dysfunction (dry eyes), and myopia with astigmatism and presbyopia. (Exhibit 24F/3-8).

The claimant displayed good functioning during an office visit with Jennifer Gaetti, APRN, on November 10, 2021, including normal strength and range of

motion, intact sensation, and no neurological deficits. A foot exam was normal and revealed bilateral calluses. (Exhibit 23F/12). Subsequent lab work showed elevated cholesterol, low vitamin D, and improved but elevated hemoglobin A1C. (Exhibit 23F/24). Other than elevated blood pressure, the claimant had good functioning during another visit with Nurse Gaetti on December 3, 2021. She encouraged her to exercise again. (Exhibit 23F/26).

(ECF No. 9 at PageID #: 68-74).

IV. The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

3. Through the date last insured, the claimant had the following severe impairments: disorders of the skeletal spine; and osteoarthritis and allied disorders (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), except stand and/or walk for 4 hours out of an 8-hour workday; sit for 6 hours in an 8-hour workday; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance; occasionally stoop, kneel, crouch, and crawl; frequently perform bilateral reaching in all directions; frequent bilateral fingering; and no exposure to hazards or unprotected heights.

6. Through the date last insured, the claimant was capable of performing past relevant work as a substance abuse counselor and social worker. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565)

7. The claimant was not under a disability, as defined in the Social Security Act, at any time from April 30, 2019, the alleged onset date, through December 31, 2021, the date last insured (20 CFR 404.1520(f)).

(ECF No. 9 at PageID #: 64, 66, 78).

V. Law & Analysis

A. Standard of Review

11

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

**B. Standard for Disability**

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the

national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.*

### C. Discussion

Claimant raises two issues on appeal: (1) whether the ALJ complied with Social Security Ruling ("SSR") 16-3p when evaluating her symptom allegations and (2) whether substantial evidence supports the ALJ's RFC in the absence of consideration of whether Claimant required a cane. (ECF No. 11 at 17).

**1. The ALJ properly applied SSR 16-3p in discounting Claimant's subjective allegations.**

Claimant argues she "is entitled to judicial relief because the ALJ's too vague assessment of her physical symptom allegations does not permit meaningful judicial review." (ECF No. 11 at 17). Claimant asserts she "does not know *why* the ALJ discounted her statements regarding the intensity and persistence of her physical symptoms" because while the ALJ summarized Claimant's treatment, she "never actually discussed any of the prescribed factors in a manner that explained *why* she found Plaintiff's allegations to be incredible." (*Id.* at 19-20). To the extent the ALJ relied on "inconsistencies" demonstrated by certain medical records, she argues that these records are not actually inconsistent with her symptom allegations because (1) an April 2020 occupational therapy assessment documents her activities of daily living prior to two falls and Claimant "testified that her functioning deteriorated *after* these falls" and (2) a notation from

13

a November 9, 2021 eye exam that Claimant "required glasses for driving" does not actually mention when Claimant last drove such that it "does not contradict Plaintiff's testimony that she stopped driving following her April 2020 falls." (*Id.* at 20-22). Thus, Claimant argues the ALJ's decision does not build "an accurate and logical bridge between the evidence and the resulting decision." (*Id.* at 22).

The Commissioner responds that "[i]n finding that the evidence did not support additional functional limitations, the ALJ cited several valid considerations," including "numerous medical records indicating that Plaintiff retained good range of motion, strength, muscle tone, reflexes, sensation, coordination, and gait;" "Plaintiff's various treatment modalities, including neck surgery, physical therapy, medication, and injections" from which she frequently benefited; Claimant's own testimony about her activities prior to the April 2020 hospitalization; and the opinions of state agency physicians. (ECF No. 14 at 7-8). The Commissioner asserts that the ALJ "did not ignore contrary evidence" but rather "reasonably concluded that Plaintiff's allegations of disabling limitation were not entirely consistent with the record." (*Id.* at 8). Concerning the specific records, the Commissioner argues that (1) because Claimant alleged she became disabled on April 30, 2019, her activities between that date and the April 2020 hospitalization were relevant to whether she was disabled at that time; and (2) the ALJ's interpretation of the November 2021 eye exam notation was reasonable because it was "certainly suggestive that [Claimant] continued to drive." (*Id.* at 9-10).

Claimant replies that "the ALJ's findings mischaracterized the underlying evidence of record" because "[a] review of all 445 pages of Exhibit 8 does not indicate any statements regarding Plaintiff having experienced significant benefit from treatment" and "the ALJ's citation to 'relatively moderate abnormal objective findings' ignores the fact that Plaintiff's

14

cervical degenerative disease advanced during the relevant time." (ECF No. 15 at 1-2). Claimant also argues that the ALJ did not discount her statements due to the content of the state agency physicians' opinions but rather "[t]his is the rationale of defense counsel and not the ALJ." (*Id.* at 2). She argues that regardless of when she initially alleged her disability began, the relevant question was whether she established a period of disability before her December 31, 2021 date last insured and she "presented strong evidence that she required a hand-held assistive device to assist with standing and walking following her April 2020 falls." (*Id.* at 3). As to the eye exam, Claimant argues that because her application for disability was not based on vision loss, her ability to drive "should not serve as substantial evidence to discount [her] testimony." (*Id.* at 4).

The evaluation of a claimant's subjective complaints rests with the ALJ. *See Siterlet v. Sec'y of HHS*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers*, 486 F.3d at 248 (noting that "credibility determinations regarding subjective complaints rest with the ALJ"). In evaluating a claimant's symptoms, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304.

Beyond medical evidence, SSR 16-3p sets forth seven factors that the ALJ should consider: daily activities; location, duration, frequency, and intensity of the pain or other symptoms; factors that precipitate and aggravate the symptoms; type, dosage, effectiveness, and side effects of medication to alleviate pain or other symptoms; treatment other than medication; any measures other than treatment the individual uses to relieve symptoms; and any other factors concerning the individual's functional limitations and restrictions. 2017 WL 5180304 at *7-8. The ALJ need not analyze all seven factors but should show that she considered the relevant

evidence. *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005). SSR 16-3p states:

> [I]f an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, we will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities or abilities to function independently, appropriately, and effectively in an age-appropriate manner.

The ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms . . . and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304; *see also Felisky v. Bowen*, 35 F.2d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so."). While a reviewing court gives deference to an ALJ's credibility determination, "the ALJ's credibility determination will not be upheld if it is unsupported by the record or insufficiently explained." *Carr v. Comm'r of Soc. Sec.*, No. 3:18CV1639, 2019 WL 2465273, at *10 (N.D. Ohio April 24, 2019) (citing *Rogers*, 486 F.3d at 248–49), *report and recommendation adopted*, 2019 WL 3752687 (N.D. Ohio Aug. 8, 2019).

The ALJ determined that "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms" but that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence." (ECF No. 9 at PageID #: 68). Specifically, the ALJ noted:

> The claimant's treatment has included physical therapy and use of numerous medications like Mobic, Ambien, zolpidem, amlodipine, loratadine, lisinopril, omeprazole, meloxicam, ibuprofen, Imitrex, and tizanidine. Overall, treatment notes document relatively moderate abnormal objective findings and significant benefit from treatment. (Exhibit 8F).

(*Id.*).

The Court agrees with the Commissioner that the ALJ properly applied SSR 16-3p. In setting forth Claimant's medical history, the ALJ indicated that the medical records were inconsistent with the severity of her symptom allegations. The ALJ cited records where providers reported Claimant did not appear to be in any distress despite her claims of extreme pain. (*Id.* at PageID #: 782, 882, 887, 891, 1195, 1311, 1367, 1396, 1464, 1478). The ALJ also cited multiple instances from April 2019 until May 2021 where Claimant was reported to have a normal gait. (*Id.* at PageID #: 1177, 1184, 1210, 1223, 1228, 1231, 1464).

The ALJ also properly considered the relief Claimant received from certain treatment. Contrary to Claimant's argument that treatment did not result in significant improvement, the records show that Claimant reported physical therapy helped reduce her pain. (*Id.* at PageID #: 1217). Claimant initially rated her pain as "7/10" in August 2019 but indicated she was relatively "pain free" a month later. (*Id.* at PageID #: 1212, 1217-18). As the ALJ noted, the records indicate Claimant received temporary relief from cervical injections. (*Id.* at PageID #: 1367, 1397, 1404). One year following Claimant's surgery, Dr. Eubanks reported she was "doing very well" overall and was "very grateful" for her care. (*Id.* at PageID #: 1517). Additionally, in September 2021, Claimant reported to a new pain management provider that she "did very well" with tramadol. (*Id.* at PageID #: 1569).

Claimant's argument concerning the ALJ's statements about her activities of daily living and the eye exam essentially asks the Court to reweigh the evidence in support of her claim, which the Court cannot do. *McQuade v. Comm'r of Soc. Sec.*, No. 1:21CV834, 2022 WL 4375984, at *2 (N.D. Ohio Sept. 22, 2022). The fact that substantial evidence may support an alternative conclusion is insufficient to disturb the ALJ's finding. If substantial evidence

17

supports the Commissioner's decision, the Court must defer to it "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).

Because substantial evidence supports the ALJ's decision to discount Claimant's subjective allegations, the Court will not disturb the opinion.

### 2. The RFC is supported by substantial evidence.

Claimant argues the RFC is not supported by substantial evidence because "the record demonstrates that Plaintiff required a cane to assist with standing and walking following her April 2020 falls, and the ALJ's RFC finding did not account for her cane usage." (ECF No. 11 at 23). In response, the Commissioner relies on the ALJ's step three finding that Claimant did not meet a listing because "[t]here is no evidence indicating that the claimant cannot perform fine and gross movements with at least one upper extremity due to a combination of extremity-related limitations and the use of a medically necessary mobility device." (ECF No. 9 at PageID #: 66). The Commissioner argues that the ALJ explained at step three that the record did not support the use of a medically necessary mobility device; this conclusion was supported by substantial evidence; and Claimant's belief that the record could support a different reading of the evidence is not a sufficient basis for remand. (ECF No. 14 at 10-11). Claimant replies that the ALJ did not make a specific finding regarding medical necessity because "[i]t is unclear whether the ALJ found that the Plaintiff did not demonstrate the required extremity-related limitations, the required need for a medically necessary mobility device, *or* both." (ECF No. 15 at 4).

The Court agrees with Claimant that the ALJ's finding that she did not meet a listing did not amount to an explicit finding that a cane was not medically necessary. However, the relevant question is whether the RFC was supported by substantial evidence. On that point, the Court

18

agrees with the Commissioner.

> Social Security Ruling 96-9p explains that an ALJ should "find that a hand-held assistive device is medically required," only where there is "medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information."

*Jones v. Comm'r of Soc. Sec.*, 815 F. App'x 926, 931 (6th Cir. 2020) (citing SSR 96-9, 1996 WL 374185, at *7). While Claimant points to instances where providers noted her use of a cane, she points to no records establishing that the cane was medically necessary or the specific circumstances under which it was needed. In detailing Claimant's medical history, the ALJ recognized instances where she used a cane but, as discussed above, also detailed multiple instances where Claimant was observed with normal gait. Thus, the ALJ did not err in failing to include the use of a cane in the RFC and the RFC is supported by substantial evidence.

Furthermore, while Claimant argues that "[t]his issue is case determinative according to the VE who testified at Plaintiff's hearing," such argument appears to be based on a misreading of the record. In response to questioning by Claimant's representative, the VE testified that if the need to use a cane were added to the RFC, there would not be *light* jobs available in the economy. (ECF No. 9 at PageID #: 129). However, the VE also testified that Claimant would be able to perform her past relevant work as a substance abuse counselor and social worker as performed in the national economy and the addition of a cane to the RFC would be "a moot point, because past work is classified as *sedentary*." (*Id.* at PageID #: 120, 128 (emphasis added)).

## VI. Recommendation

Based on the foregoing, it is RECOMMENDED that the Court OVERRULE Claimant's Statement of Errors and AFFIRM the Commissioner's decision.

Dated: November 3, 2023

                                                      *s/ Carmen E. Henderson*
                                                      CARMEN E. HENDERSON
                                                      U.S. MAGISTRATE JUDGE

_____

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F. 3d 520, 530-31 (6th Cir. 2019).